We move to our next case, which is Ramirez-Gastiaburo v. Bondi. All right, Mr. Bankebonner, am I pronouncing that right? Yes, thank you, Your Honor. All right, you've reserved three minutes for rebuttal, so seven to begin. You may proceed. Thank you, Your Honor. May it please the Court, my name is Edgar Loy Fankbonner, and I'm here on behalf of Petitioner Gregorio Ramirez-Gastiaburo, his wife, and his children in their petition for review of a decision by the Board of Immigration Appeals dismissing their appeal. The following facts are undisputed. In November of 2022, the petitioner and his wife were attacked by a criminal organization known as Los Choneros that operates throughout Ecuador. They were stabbed and slashed and forced to leave their ancestral home, the land where they and their children had lived. Thus far, they've suffered serious physical injuries as a result. They underwent medical treatment, and they promptly reported the incident to the authorities in Ecuador. The authorities told them in no uncertain terms that they would not take action against their assailants. Because they weren't identified and because it was a remote area, isn't that what? Because it was a remote area and because the authorities are essentially powerless to take action against these individuals. I thought it was because they hadn't been identified by your client. That may be, but certainly the police have a duty to investigate a claim such as this. I mean, there's no reason to assume that people who would commit a crime like this would be known to the complainants. But the dispute is over the use of your client's land, right? I don't know that there's a dispute to speak of here. These individuals arrived, and they attacked the petitioner and his family and forced them to leave. But they requested them. They attacked them for a reason, right? They wanted something. Correct. And what they wanted was access to their land. Correct. And the land now is no longer, I mean, the land is out of the picture now, right? Presumably the Gineros or somebody else is using the land, right? Well, that doesn't take away the fact that the land belongs to the petitioner. But what is the reason to think that something is going to happen to your client, I guess, if your client returns? Because he has nowhere else to return except to that land. They had to flee. They had to hide at a neighbor's home. They have no place else to go in Ecuador, Your Honor. And the decision of the immigration judge. Well, I mean, they have everywhere else to go in Ecuador, right? They could go anywhere in Ecuador. They may have trouble earning a living. It may be uncomfortable for them to start life in a new community. On the other hand, they came here, where they presumably didn't initially even speak the language, where it would be even harder to make a new life, where they didn't have any land and they didn't know anybody and they couldn't speak the language and they're not originally part of the culture. So if they could do that, why can't they move to the other side of Ecuador? Well, there's no evidence in the record that they can. Let me try to understand that. Why do we need evidence? There are flights to Ecuador. They are Ecuadorian citizens, right? They have passports. They can go to Ecuador. And there's no internal passport required in Ecuador, as there once was in the Soviet Union, to move to a different city than you started life in? No, that's correct. But there's no evidence that they're able to do so. There's no evidence that they have the wherewithal to do so. But, I mean, I guess isn't it your client's burden to show that he will be harmed or they will be harmed if they return? Correct. And so, you know, there's nothing in the record to suggest that they can't move. And doesn't that absence of evidence hurt your client's argument? The issue is that the question of internal relocation is to be raised by the Department of Homeland Security. The petitioner doesn't have an affirmative duty to raise that issue. We have a finding that the gang members would not be interested in harming respondents in another part of the country as they are no longer impediments to the gang members' use of the land. What is there in the record that invalidates that finding? Well, the question is why must they be forced to abandon their land? Why must they relocate? This is something that DHS didn't raise and didn't develop on cross-examination or in their argument. I mean, that's pretty hard to adjudicate the ownership of land in Ecuador from the United States. The issue here is that the court shifted the burden onto my client to affirmatively show that he could not relocate. That burden rightly lies with DHS. That's the finding in Manning v. Barr. And the court didn't develop this. It didn't even cross-examine my client or didn't examine my client on the question of internal relocation. But did your client say he couldn't relocate? My client said that the gang has nationwide reach, but he didn't make any— But is there anything in the record that suggests that the gang cares about your client at this point? Well, they're occupying their land. And if they were to assert their rights to that land— But it seems to me your argument is that my client, if returned to Ecuador, is storming right back to the land and sort of demanding it back, and if he does that, he's going to be harmed. But I'm not sure that that's a basis for saying that you're covered by the Convention Against Torture. Well, the issue here is that they were tortured in the past. There's a showing that they were tortured, as that term is defined by the Act and in this circuit. And they were tortured as punishment and as a form of coercion, and this occurred with the acquiescence of the local authorities, the de facto acquiescence of the local authorities. That would be exactly the way you would state the claim for asylum, I think, to say the authorities are incapable of doing anything about it. But I thought the rule with respect to the Convention Against Torture is different and that it requires something more affirmative from the authorities, including advanced knowledge of what's going to happen. It requires acquiescence, which encompasses willful blindness. In this case, they were told that this had occurred, and they chose not to take action. This is de facto acquiescence. It's hard to conjure a scenario where when the authorities don't need to affirmatively state, we support the Tornados and their actions against you. They can simply act by not acting, by refusing to investigate a claim against these parties, by refusing to take any action whatsoever. This is the government's duty, and it— But the only thing in the record that there's acquiescence is that they didn't investigate the complaint that was made by your client initially. There's nothing else, right? I mean, this is what police are supposed to do. Well, okay, but that's not my question. My question is there's nothing else, right? There's no other evidence in the record about how the Tornados control the government or the government and the Tornados are in bed together or that there's other relationships between them. No, Your Honor, but it isn't necessary. All that's required for the Tornados to do exactly what they want is for the authorities to refuse to investigate their actions, which is exactly what happened here. Now, this isn't an argument that torture is widespread in Ecuador. This isn't an argument that it may happen to others. This argument turns on the fact that it did happen to this family and that the authorities— The more you argue that they're going to be harassed or tortured or killed if they move to one particular point in Ecuador, which is their former land or their present land, however you want to characterize it, the more you argue that, the more you justify the finding that they can move anywhere else in Ecuador. I'm not sure that's the case. I mean, this is— Well, if you're not sure that's the case, I mean, that's fine, but it's your burden to prove that they will be tortured. You seem to be saying they'll be tortured if they go back to their land and have a confrontation with the Chimeros, but there's nothing to suggest that that's the only way to return to Ecuador, is there? Well, they remained in Ecuador for approximately another month or six weeks, and they did so in hiding. And, again, in order to avail themselves of the Convention Against Torture, a claimant under CAT should not have to hide in order to avoid being tortured in their home country. The issue here at root is that the record was undeveloped. The court didn't really inquire into the CAT claim in any meaningful way. The court decided this with a generic phrase that, frankly, it turns out over and over again, that this is about stringing together of suppositions. It never truly addressed the heart of the claim, and it also, again, violated Manning v. Barr, or rather ignored Manning v. Barr because it doesn't acknowledge that that case exists, and imposed a burden on the petitioner to develop the record to show that relocation was impossible when that was not his burden. That's really the issue here. Well, we've gone over, but you've got three minutes for rebuttal, so let's hear from your adversary. That's Mr. Dextre. Am I pronouncing that right? Dextre. Dextre. Thank you, Your Honor. Thank you. You may proceed. May it please the Court. My name is Christopher Dextre, and I am here on behalf of the United States Attorney General. Good morning, Your Honors. The only question before you today is whether the evidence in the record compels reversal of the agency's denial of protection under the Convention Against Torture. The agency correctly determined that the petitioners did not meet the burden of proof to establish that it's more likely than not that they would be tortured upon removal to Ecuador, given that their claim is based on a series of suppositions, with no evidence in the record indicating that they would be specifically targeted in the future. Petitioners were attacked on one occasion in November of 2022 because they refused to let the Chineros gang use their land. The record substantiates that the Chineros were interested in the petitioners because of their land, and no other motivation proffered by petitioners is supported by the evidence. Per the lead petitioner's own testimony, they no longer own that land. They no longer possess it. They don't know what's become of it. Therefore, with the land being the only apparent motivation behind the Chineros attack, and that motivation is no longer in play, given that they don't have it anymore. Who has the burden to show that they cannot settle elsewhere in Ecuador? Well, petitioners argue that. Without risking torture. Well, petitioners argue that Manning v. Barr puts a burden on, that there is no burden that can be placed. So what do you do with the Manning case, which dealt with somebody who claimed he would be vulnerable to torture anyplace in the country of Jamaica? Right. Well, I don't think Manning v. Barr is ultimately applicable here, given that the IJ and the board, they don't actually put the burden on the petitioners that they can't resettle. The language used by the IJ in that case clearly is formed as, like, you know, that the petitioner has not established that he could not relocate to another part of Jamaica where he could live without being identified. Here there are phrasings that are simply findings by the agency relating to relocation, and then ultimately findings as to relocation being possible, that it's not impossible. But there's never any analogous statement from the agency, from either the IJ or the board, saying that they haven't established, or even that they haven't shown relocation. At the most, they come close to saying, like, they haven't shown that the gang would be interested in them. But then even there, by the board, the following sentence says something along the lines of, well, you know, the immigration judge further found that there is no evidence that they could not, that there's no evidence that the Chineros would be interested in them if they were to relocate to another part of the country. It's in your argument that once it is fairly established that the gang would no longer be interested in them, it was no longer an issue as to where they would settle in Ecuador. They could settle anywhere in Ecuador, except on their own land. Well, I believe from the agency's findings, clearly the petitioners do not establish that the Chineros would still be interested in them. And that, to me, is a dispositive finding. Because if it's clear that they would not be interested in them in the future for any reason, then it becomes, you know, it's not really significant to make a finding at all whether or not they can relocate. That's my question. Yes. So it is dispositive. Are you suggesting that there's no reason to think that if they went back to their own farm, the Chineros would still not be interested in them? Well, if they went back to their own farm, I don't know. To me, that opens up a lot of questions in terms of that counterfactual regarding, you know, what's the state of that farm. They don't know what's the state of that farm. And they've never indicated explicitly in the record that they would actually go back to that farm. And so there's no reason to think that they even would do that. If they were to go back there, again, I don't think the record really points either way in terms of whether or not they would be harmed if they were to go back. Petitioner's counsel mentions that, well, this is their ancestral land. They have nowhere else to go to. And, sure, the record does indicate that they have no family elsewhere. I love the premise for the idea that the gang would no longer be interested in them is that they would not go back to challenge the gang and try to take back their own land. Yes. The idea is that they would attempt to go and be looked at elsewhere. As Your Honor pointed out, it would be uncomfortable for them to go elsewhere. But there's no reason to indicate that they cannot do that. And it is their ultimate burden to prove that it's more likely or not that they would be tortured. But the record doesn't even make clear whether or not the Trenators are still using the land. They may have moved on, right? That's entirely possible. But, again, ultimately, that cuts against the petitioner's burden. But this is not a situation where it's a status case, right? Where it's like, well, they're a member of one family or one gang, and so they can't shake that status when they get back. This was a dispute about access to land. The land may or may not be in the control of the Trenators. But it's not even clear that if the petitioner went back to the land that the Trenators would still be there. We don't know that. Correct? Yes, correct. And for what it's worth, I don't think it's even clear that the Trenators are as much of a threat now than they were in the past. The record clearly demonstrates or clearly indicates that they've been weakened over the past few years. In the record on page 246 starts an Insight Crime Report, where it speaks about how recent changes in their leadership has sparked infighting between the group and spirited gangs. However, the next two years, the Trenators have steadily lost power in an alliance led by another rival gang. But that may be a basis on which one could find that they're not in any danger. But that's not something the immigration judge or the BIA relied on as the basis for its ruling, right? Sure, it's not. And unlike the situation with an appeal from the district court, we can't say we find.  Okay. I'm just pointing out that, you know, it's in the record. You know, country condition evidence, you know, can be considered. Same thing with relocation. Locally, even here, it's not necessary because I think it's the response to finding that because it was a series of suppositions. And, again, which was not challenged in the petitioner's brief. Neither was the challenge that they would be specifically targeted. I think on that alone, this case is clearly supported by school. The agency's decision is clearly supported by substantial evidence. All right. Thank you. We'll hear from Mr. Pat Conner for three minutes of rebuttal. Thank you, Your Honor. Very briefly, I don't think it's lost on this court that opposing counsel cited the immigration judge's decision saying that petitioner, quote, has not established that he cannot relocate. This is what our argument turns on. The immigration judge improperly shifted that burden onto the petitioner. I don't mean to belabor the following point with respect to the ownership of the land. That's not entirely clear. The question of ownership of the land, it only shows up in the context of cross-examination, where counsel for the Department of Homeland Security pointedly asked the petitioner about the land that he no longer owns. There's nothing in the record to indicate that he no longer owns it. Possession and ownership are two distinct matters. Other than that, I have nothing further unless the court has any questions. All right. Okay. Well, thank you both. We will reserve the decision. Thank you very much, Your Honor. Thank you.